James Brown (MT No. 8916)
THE JAMES BROWN LAW OFFICE, PLLC
30 South Ewing Street, Suite 100
Helena, Montana 59601
Ph.: (406) 925-1745
Email: jim@thunderdomelaw.com

Thomas R. McCarthy*
Tyler R. Green*
Bryan Weir*
Cameron T. Norris*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Ph.: (703) 243-9423
Email: tom@consovoymccarthy.com

* *Motion for admission*
*pro hac vice forthcoming*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., REPUBLICAN NATIONAL COMMITTEE; NATIONAL REPUBLICAN SENATORIAL COMMITTEE; MONTANA REPUBLICAN STATE CENTRAL COMMITTEE,<br><br>Plaintiffs,<br><br>v.<br><br>STEPHEN BULLOCK, in his official capacity as Governor of Montana; COREY STAPLETON, in his official capacity as Secretary of State of Montana,<br><br>Defendants. | No. _____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs, Donald J. Trump for President, Inc., the Republican National Committee, the

National Republican Senatorial Committee, and the Montana Republican State Central

1

Committee, bring this action against Defendant Stephen Bullock, in his official capacity as Governor of Montana, and Defendant Corey Stapleton, in his official capacity as the Secretary of State of Montana, to have Governor Bullock's August 6, 2020 directive declared unlawful, to enjoin its enforcement, and to obtain all other appropriate relief. Plaintiffs allege as follows:

## INTRODUCTION

1.      The U.S. Constitution entrusts state legislatures to set the time, place, and manner of congressional elections and to determine how the state chooses electors for the presidency. *See* U.S. Const. art. I, §4 (Elections Clause), art. II, §1 (Electors Clause). Montana's constitution generally provides that all "legislative power is vested in [the] legislature," Mont. Const. art. V, §1, and specifically provides that "[t]he legislature shall provide by law the requirements for residence, registration, absentee voting, and administration of elections," Mont. Const. art. IV, §3. The Montana State Legislature has enacted laws to that end.

2.      In a direct usurpation of the legislature's authority, Governor Bullock issued a directive purporting to allow universal vote-by-mail balloting for the November 2020 election. The result is a patchwork election code that has varying deadlines and procedures across Montana's 56 counties. This brazen power grab was not authorized by state law and violates both the Elections Clause and Electors Clause of the U.S. Constitution. The Governor's directive is invalid and must be enjoined.

3.      Moreover, in his haste, the Governor created a system that will violate eligible citizens' right to vote. By allowing vote-by-mail ballots to be automatically sent to every voter— including voters who have moved, voters who have died, and voters who don't want a ballot—he created a recipe for disaster. Rushing to automatically mail ballots to all voters invites fraud, coercion, theft, and otherwise illegitimate voting. Fraudulent and invalid votes dilute the votes of

honest citizens and deprive them of their rights under the Fourteenth Amendment.

4.      To this end, the Democratic Party has long sought to implement universal vote-by-mail and other changes to standard election laws because—according to the party's lead lawyer—such changes will help Democrats' electoral prospects. But Democrats have largely been unable to convince state legislatures to adopt them. So they are now using the COVID-19 crisis as a means to accomplish their goals via litigation and, like here, executive fiat.

5.      The Governor's power grab under the cover of COVID-19 is particularly egregious. The Governor is running for U.S. Senate as a member of the Democratic Party, and his race is one of the most competitive in the country. So he is using his current position to force a brand-new election system on Montanans that, according to his own party, will sway the election in his favor. This action cannot stand.

6.      For all these reasons, the Governor's Election Directive is illegal and must be enjoined.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction because this action arises under the Constitution and laws of the United States. 28 U.S.C. §§1331 & 1343.

8.      Venue is proper because a substantial part of the events giving rise to the claims occurred in this District, and the Defendants reside in this District. *Id.* §1391.

## PARTIES

9.      Plaintiff Donald J. Trump for President, Inc. is the principal committee for President Donald J. Trump's reelection campaign with its headquarters at 725 Fifth Avenue, 15th Floor, New York City, NY 10022.

10.      The committee spends resources, including hiring campaign staff in Montana to

encourage Montanans to reelect the President. It also spends significant sums of money in Montana to further those interests. The committee will devote its resources, including its campaign staff in Montana to monitor the results of the presidential election in Montana. Changes to Montana election laws require the committee to change how it allocates its resources, and the time and efforts of its campaign staff, to achieve its electoral and political goals.

11.     Republican National Committee (RNC) is a national political party with its principal place of business at 310 First Street S.E., Washington D.C., 20003.

12.     The RNC organizes and operates the Republican National Convention, which nominates a candidate for President and Vice President of the United States.

13.     The RNC represents over 30 million registered Republicans in all 50 states, the District of Columbia, and the U.S. territories. It is comprised of 168 voting members representing state Republican Party organizations, including three in Montana.

14.     The RNC works to elect Republican candidates to state and federal office. In November 2020, its candidates will appear on the ballot in Montana for federal and state offices. And the Cook Political Report lists both Montana's Senate and House races as "competitive"— with the Senate race a "toss up."

15.     The RNC has a vital interest in protecting the ability of Republican voters to cast, and Republican candidates to receive, effective votes in Montana elections and elsewhere. The RNC brings this suit to vindicate its own rights in this regard, and in a representational capacity to vindicate the rights of its member voters and candidates.

16.     The RNC also has an interest in preventing the Governor's unilateral changes to Montana election law. Major or hasty changes confuse voters, undermine confidence in the electoral process, and create an incentive to remain away from the polls. Thus, the Governor's

Election Directive forces the RNC to divert resources and spend significant amounts of resources educating voters on those changes and encouraging them to vote regardless.

17.     Plaintiff National Republican Senatorial Committee (NRSC) is a national political party committee with its principal place of business at 425 2nd St NE, Washington, D.C. 20002.

18.     The NRSC is the only national political party committee exclusively devoted to electing Republican candidates to the U.S. Senate.

19.     The NRSC spends significant resources in Montana to encourage Montanans to reelect Steve Daines to the U.S. Senate. The committee will devote resources to inform voters of election procedures and to monitor the results of the Senatorial election in Montana. Changes to Montana election laws require the committee to change how it allocates its resources, and the time and efforts of its staff, to achieve its electoral and political goals.

20.     Plaintiff Montana Republican State Central Committee (MTGOP) is a political party in Montana with its principal place of business at PO Box 935, Helena MT 59624. The MTGOP represents Republican voters in Montana.

21.     Defendant Stephen Bullock is the Governor of Montana. He issued the challenged directive. The Governor is sued in his official capacity.

22.     Defendant Corey Stapleton is the Secretary of State of Montana. Secretary Stapleton is Montana's chief elections officer and oversees all elections within Montana. His duties include ensuring that all election laws and campaign disclosure requirements are enforced, certifying the official lists of candidates for elections, and certifying election results. The Secretary is sued in his official capacity.

## BACKGROUND

### I.     The Perils of Hastily Moving to Universal Vote-By-Mail Without the Necessary Safeguards

23.     Creating opportunities for ineligible voters to cast ballots invites fraud and undermines the public's confidence in the integrity of elections—all of which violate the right to vote.

24.     According to the Commission on Federal Election Reform—a bipartisan commission chaired by former President Jimmy Carter and James Baker, and cited extensively by the U.S. Supreme Court—absentee voting is "the largest source of potential voter fraud." *Building Confidence in U.S. Elections* 46, https://bit.ly/3dXH7rU (*Carter-Baker Report*). Many well-regarded commissions and groups of diverse political affiliation agree that "when election fraud occurs, it usually arises from absentee ballots." Michael T. Morley, *Election Emergency Redlines* 2, https://bit.ly/3e59PY1 (Morley, *Redlines*).

25.     Such fraud is easier to commit, easier to meaningfully scale, and harder to detect with absentee voting than in-person voting. As one federal court put it, "absentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004).

26.     "Absentee balloting is vulnerable to abuse in several ways": For one, ballots are sometimes "mailed to the wrong address or to large residential buildings" and "might get intercepted." *Carter-Baker Report* 46. For another, voters "who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation." *Id.* And "[v]ote buying schemes are far more difficult to detect when citizens vote by mail." *Id.* For example, "[i]ndividuals can sign and sell their absentee ballot," or "[o]ne spouse can coerce the other to sign the ballot and hand it over to them to vote fraudulently."

27.     Empirical data shows that this risk of abuse is magnified by the fact that "many states' voter registration databases are outdated or inaccurate." Morley, *Redlines* 2.

28.     A 2012 study from the Pew Center on the States—recently cited by the U.S. Supreme Court—found that "[a]pproximately 24 million—one of every eight—voter registrations in the United States are no longer valid or are significantly inaccurate"; "[m]ore than 1.8 million deceased individuals are listed as voters"; and "[a]pproximately 2.75 million people have registrations in more than one state."

29.     Similarly, a 2010 study by the Caltech/MIT Voting Technology Project found that roughly 9% of listed registration records in the United States are invalid. On top of those invalid records, "in the typical state 1 in 65 records is duplicative, meaning that the same registrant is listed multiple times." The same study found that "[i]n the typical state, 1 in 40 counted votes in the 2008 general election cannot be matched to a registrant listed as having voted" and that "1 in 100 listed registrants is likely to be deceased."

30.     These discrepancies result from bureaucratic failures, intentional fraud, and inadvertent mistakes.

31.     Because of these widespread inaccuracies in a state's voter registration records, a state that sends ballots to all registered voters will send ballots to persons ineligible to vote and others with fake registrations, invalid registrations, or outdated registrations, and to the deceased. Placing hundreds of thousands of ballots "outside of both election officials' control and the hands of the voters who are supposed to be casting them raises a serious threat to both the actual and perceived integrity of the electoral system." Morley, *Redlines* 3.

32.     These risks are compounded by the practice of ballot harvesting—that is, coordinated efforts to have third parties collect absentee ballots from voters and drop them off at

polling places or elections centers.

33.     Ballot harvesters are usually politically motivated third parties—campaign workers, union members, political activists, paid personnel, or volunteers. They go door-to-door and offer to collect and turn in ballots for voters. "In some documented cases, the workers collecting the ballots have entered into voters' homes to help them retrieve and fill out their ballots."

34.     "Ballot harvesting gives third parties who may be completely unknown to both the voter and election officials the opportunity to potentially tamper with absentee ballots" in any one of a number of ways. Morley, *Redlines* 5. For instance, "[h]arvesters may pressure voters into giving them blank ballots or casting their votes a certain way," or, "[w]hen a voter has voted for the 'wrong' candidate, the harvester may surreptitiously change the vote, include additional votes to void the ballot, or simply dispose of the ballot rather than returning it." *Id.*

35.     These forms of misconduct have the potential for widespread, scalable abuse and are incredibly difficult to detect. The practice is "especially concerning when third parties who are not related to the voter—and who may not even be known to the voter—are permitted to harvest unlimited numbers of ballots, frequently without having to identify themselves to election officials or note their identity on the ballots' envelopes." Morley, *Redlines* 4.

36.     The Democratic Party, believing the practice helps their electoral prospects, has worked to unleash ballot harvesting on Montana. This year, the party sought and secured an injunction against Montana's Ballot Interference Protection Act in state-court litigation.

37.     To be sure, application-based mail-in ballots can be a legitimate feature of a state's election process, when coupled with adequate procedural safeguards to deter fraud. But given the many risks discussed above, in most states it is an *alternative* implemented carefully and slowly

and *only with* such safeguards in place.

38.     Federal law also recognizes the risks of voting by mail and thus requires certain first-time voters to present identification. *See* 52 U.S.C. §21083(b).

39.     In reaction to COVID-19, several states have altered, or tried to alter, their ordinary election practices to universal vote-by-mail for 2020 elections.

40.     Much of the push toward universal vote-by-mail has been driven by litigation initiated by the Democratic Party. The Democratic National Committee, state Democratic parties, and several affiliated groups have filed lawsuits across the country to force a hurried transition to universal vote-by-mail, eliminate voter-identification requirements, and remove other safeguards. Democrats pushed these changes long before COVID-19 because they believe that the resulting virtually unregulated and unsupervised environment will help their electoral prospects. Unable to persuade legislatures to adopt these changes, Democrats have turned to the courts to circumvent the legislative process, arguing that COVID-19 means that their preferred changes are now *mandated* by the Constitution. Indeed, according to the Democrats' top lawyer, "If [these lawsuits] gain 1 percent of the vote [for Democrats], that would be among the most successful tactics that a campaign could engage in."

41.     But COVID-19 does not warrant throwing out longstanding safeguards that protect the integrity of elections. In fact, it makes those safeguards *more* important. "[E]ven when voter registration records are accurate, voters may not be staying at their addresses of record. If stay-at-home orders remain in place, voters may be staying with family or friends for the duration of the quarantine." Morley, *Redlines* 3. "Thus, automatically mailing out millions of ballots to addresses where voters may not be located will lead to millions of unaccounted-for ballots, facilitates ballot theft, and can lead to inadvertent or intentional double voting." *Id.*

42.     The lack of safeguards has had a systemic negative impact in jurisdictions that switched to universal vote-by-mail in elections that have been administered since COVID-19 entered the country.

43.     Nevada conducted its first ever all-mail primary in June. The Las Vegas Review-Journal reported that, within the first week of voting, photographic evidence surfaced of numerous ballots "tossed in trash cans and littering apartment mailbox areas."

44.     On May 8, 2020, one Clark County voter found "about a dozen ballots pinned to the complex's bulletin board or otherwise thrown around." Over the next few days, he found many more in nearby trash cans. In a different apartment complex, another voter saw ballots "sticking out of residents' mailboxes and 'at least a dozen' were sitting in garbage cans." Another resident received a ballot at her home addressed to her deceased mother.

45.     A U.S. Postal Service worker serving the area witnessed the breadth of the problem. She recounted that, over the course of multiple days, she saw an "influx of absentee ballots"—as many as 100 in a single day—that were "'no good,'" often because they had been sent to recipients who had moved or died. "In all, she said, there were thousands [of ballots] sitting in crates with no additional safeguards and marked to be sent back to the county."

46.     Recent media reports confirm just how widespread those problems were. For the 2020 primary election, Clark County mailed out 1,325,934 ballots. Of that total, 223,469 were returned as undeliverable.

47.     Of those 223,469 undeliverable ballots, 58 percent belonged to inactive voters. But "93,585 undeliverable ballots belonged to voters classified as active in Clark County's voter rolls." Those more than 93,000 ballots returned as undeliverable from registered voters do not include the countless numbers of ballots observed strewn about apartment complexes, garbage cans, and

other locations in Clark County. The precise number of those kinds of ballots—which also should have been returned as undeliverable but were not—will never be known. Moreover, Clark County's voter rolls also contain more than 2,200 people who are deceased.

48.     New Jersey had a similar experience. Governor Murphy issued an executive order requiring that all local municipal elections in May be conducted via universal mail-in-ballot. Over 30 municipalities held nonpartisan municipal, school board, or special elections completely by mail on May 12.

49.     The results were disastrous. Ten percent of ballots that were cast were invalidated. That is more than 3 times as many invalidated mail-in votes as the 2018 general election in New Jersey.

50.     But those statistics pale in comparison to what happened in the City of Paterson. There, Alex Mendez beat his opponent Bill McKoy by just 240 votes in a bid for a city council seat. Almost immediately, however, officials encountered evidence of massive voter fraud. It began with the discovery of about 900 votes that were mailed in bulk from three individual mailboxes, including more than 300 rubber-banded together from a single a mailbox.

51.     Next, there were widespread reports of people being listed as having voted, but who say they never even received their ballots. One woman was shown an official list of people who voted who lived on her block. She confirmed that there were eight people on the list, plus herself, who she knows did not vote. A councilman reported he knew of at least another dozen cases of the same thing happening.

52.     In the weeks following the election, the New Jersey Attorney General conducted an investigation into the election, confirming voter fraud and discovering an illegal conspiracy to get Mendez elected. McKoy's attorneys revealed the Attorney General's findings in a lawsuit to

challenge the election's outcome. The election, they explained, "was rife with nonfeasance, malfeasance, and straight up voter fraud. It was a failure at every level, from the mailing of VBMs to their delivery, from the actual casting of the ballots to the receiving of same by the Board of Elections and their counting." In particular, a campaign worker for Mendez "confessed to investigators working on behalf of the [New Jersey Attorney General's] office to having stolen ballots out of mailboxes, both completed and uncompleted, on behalf of and at the direction of the Mendez campaign."

53.     The McKoy campaign explained how the fraud decided the election: "The number of legal votes rejected and illegal votes accepted exceeds the number of votes separating the candidates, and thus are sufficient to change the result of the election." But the detected illegal votes that election officials caught were likely just a fraction of the total fraudulent ballots cast. As the McKoy campaign explained: "It is impossible to know just how many ballots were stolen in this Election. Simply because some ballots were caught does not mean that all were caught. Yet, given the number that were, in fact, rejected, far in excess of the margin in the Election, it seems likely that there were many more of which we will never know for sure."

54.     On June 25, the Attorney General indicted Mendez, a sitting councilmember, and two others with multiple felonies related to election fraud, including illegally collecting absentee ballots and submitting fraudulent voter registrations. Mendez refused to withdraw his candidacy and still planned to take office in July, which led to a New Jersey judge issuing an injunction preventing Mendez from taking office. In issuing his decision, the judge explained:

> I don't see how I could let the people of Paterson have to accept the fact that this was a fair and free election, that it was a full expression of their intent. … I just think it would be a tremendous undermining of the voting system, the public trust to let Mr. Mendez be sworn in tomorrow.

55.     Governor Murphy called for Mendez to step aside, but he refused. So instead of

declaring McKoy the winner, and with charges pending against Mendez, Paterson will conduct another election for the council seat.

56.     New Jersey's July primary—which the Governor ordered to be primarily conducted via universal vote-by-mail—likewise suffered serious problems. To begin, more than 40,000 ballots were rejected. That's *eight times as many* rejected ballots as the 2016 primary election. Hudson County alone had over 6,000 rejected ballots this year, more than the entire state for 2016.

57.     To make matters worse, the primary suffered from constant delays. Although the Secretary of State had set a deadline of July 24 for counties to certify their election results, seven counties did not meet that deadline. The Secretary of State did not certify the results until over a month after the election.

58.     Republican candidate Hirsh Singh contested the results of the primary because "[t]ens of thousands of ballots remain uncounted, rejected or lost, disenfranchising tens of thousands of New Jersey voters." For example, a number of ballots were mistakenly returned to voters due to confusion at the post office. And one county clerk reported that "her office got back about 1,500 ballots that they sent out," attributing the mistake to "'garbage data' in the system."

59.     Other states had issues just keeping up with their application-based mail-in ballots. For Michigan's August 4 primary, it was recently revealed that the number of ballots recorded as received in 72% of Detroit's absentee voting precincts didn't match the number of ballots actually cast. In 46% of *all* Detroit's precincts—absentee and Election Day—the number of ballots recorded as voted did not match the number of ballots cast. A chairwoman of the county board of canvassers remarked that the count "was so inaccurate that we can't even attempt to make it right."

60.     For Wisconsin's April 2020 primary election, "the Wisconsin Election Commission received over 1.3 million requests for absentee ballots…, almost 1 million of which were

completed and returned by mail to the election offices. This was an increase of over 440 percent from the April 2016 election."

61.     Given this substantial increase, it's no surprise that errors occurred in processing those absentee ballots. For example, "[t]hree tubs of absentee ballots from Appleton and Oshkosh were found at the Milwaukee Processing & Distribution Center (P&DC) after polls closed on April 7, 2020." And—despite Postal Service guidance stating that "all ballots should be postmarked by machine or by hand"—the Milwaukee Election Office received "about 390 voter completed ballots with varying postmark issues including illegible postmarks, lack of a postmark, undated postmarks, or hand-stamped postmarks."

62.     For New York's June 2020 primary election, "[m]ore than 414,000 New York City residents voted by absentee ballot in the June 23 primary, which is more than 10 times the number of absentee ballots cast in the 2016 primary, according to court documents." On August 3—more than six weeks after the election—results of the primary election between Rep. Carolyn Maloney and Suraj Patel for New York's 12th District remained unknown. On that day, a federal district judge in New York "ordered the counting of certain mail ballots that arrived after Election Day but without a postmark to prove when they were sent."

63.     It is still not known why absentee ballots were delivered without a postmark to election offices in New York even though the Postal Service's "policy is to postmark all ballots, and the city was assured it would happen." But a manager at a New York postal processing facility testified during the lawsuit over the absentee ballots and "offered two possibilities." "First, postmarking machines can reject mail if, for example, it isn't 'folded over properly.' On Election Day, USPS staff were ready to grab bypassed ballots and postmark them by hand." That happened "'for thousands of ballots'" on Election Day, but the manager "wasn't sure … if this happened

before June 23." Second, "most prepaid mail usually skips postmarking altogether and goes 'directly to a sortation machine.'" "On Election Day, USPS staff overrode that procedure and forced everything through the postmarking system. But again, [the manager] wasn't sure about before June 23, saying it was 'very possible' that some ballots went straight to sorting."

64.     There is no evidence that the Postal Service will invoke those manual-override processes on days *after* an Election Day to ensure postmarks are affixed both to improperly folded mail and to prepaid ballots placed in the mail after an election. Even so, the Postal Service's pre-election performance alone led the co-chair of the New York State Board of Elections to testify that he "'do[esn't] have a great deal of confidence in the U.S. Postal Service.'"

## II.     Montana's Existing Vote-by-Mail Laws

65.     As a general matter, the Montana State Legislature has chosen *not* to automatically send vote-by-mail ballots to voters or conduct universal vote-by-mail elections, except in limited circumstances. Montana law contains two sets of provisions that govern mail-based voting.

66.     The first set, Montana Code §13-13-201, et seq., allows voters to cast application-based mail-in ballots as an alternative to in-person voting in any election.

67.     Importantly, a voter must affirmatively request the ballot. *Id.* §13-13-211. The voter can do so by filling out the state's standardized application, which requires the voter to provide his or her name, address, birthday, and written signature. The voter can also make a written request as long as it includes the same information. Mont. Code §13-13-212(1)(a). Montana law also requires election officials to match the voter's signature on the application to the voter's signature on the registration form before sending out the ballot. *Id.* §13-13-213(3)(a).

68.     A voter can request that a vote-by-mail ballot be sent automatically for all future elections "as long as the [voter] remains qualified to vote and resides at the address provided in the initial application." *Id.* §13-13-212(3). But in those cases, Montana imposes strict procedures

to confirm that the voter still lives at the registered address. Every other year, the county election administrator must review the U.S. Postal Service's national change of address system to determine if any voters that have chosen an evergreen vote-by-mail ballot have moved. *Id.* §13-13-212(4)(b)(i). If such a voter has moved, the administrator must "mail a forwardable address confirmation form" to the voter who is listed in that database as having moved.  *Id.* §13-13-212(4)(b)(i). That form asks that the voter confirm his or her "driver's license number or the last four digits of the [voter]'s social security number" and whether the voter still wants to receive vote-by-mail ballots in future elections. *Id.* §13-13-212(4)(b)(ii). If the voter does not respond, then the "election administrator *shall* remove the [voter] from the absentee ballot list." *Id.* §13-13-212(4)(b)(vii).

69.    Montana sends out its application-based vote-by-mail ballots 25 days before the election. *Id.* §§13-13-213(4), 13-13-205(1)(a)(ii). And it must be received by 8pm on Election Day. *Id.* §13-13-201(3).

70.    The second set of provisions governing mail-in voting, Montana Code §13-19-101 et seq., provides for universal vote-by-mail elections only for limited local elections, such as those for school, water, and fire districts. *Id.* §13-19-104. Montana law flatly prohibits them for "a regularly scheduled federal, state, or county election" or when there is a "regularly scheduled or special election when another election in the political subdivision is taking place at the polls on the same day." *Id.* §§13-19-104(3)(a), (c). Though Montana law permits a locality to conduct such elections when there is only one "special federal or state election" on a given election day, it can do so only if "authorized by the legislature." *Id.* §13-19-104(3)(b).

71.    And because universal vote-by-mail elections are meant to be local affairs, either the local election administrator or the local governing authority must propose to conduct such an

election for it to occur. *Id.* §§13-19-201, 202.

72.     Restricting universal mail-in-ballot elections to limited, small elections is meant to deter fraud and abuse that such elections invite. *See supra* Section I. To this end, the Montana State Legislature balanced all the relevant concerns, known and unknown, in setting these limits on universal vote-by-mail. It explained "that sound public policy concerning the conduct of elections often requires the balancing of various elements of the public interest that are sometimes in conflict." *Id.* §13-19-101. And "[a]mong these factors are the public's interest in fair and accurate elections, the election of those who will govern or represent, and cost-effective administration of all functions of government, including the conduct of elections." *Id.* As the Montana State Legislature has explained, "when these and other factors are balanced, the conduct of elections by mail ballot is potentially the most desirable of the available options in certain circumstances." *Id.*

73.     In a universal vote-by-mail election, legal only for certain local elections, those voters who have requested application-based mail-in ballots be sent to them indefinitely, *see supra* ¶68, will continue to receive their ballots by mail. Those voters who have *not* opted into that system will still automatically be sent a ballot "at the most current address available from the official registration records," Mont. Code §13-19-206(3)(a), despite that address not going through the same confirmation process as is applicable to application-based mail-in voters, *see supra* ¶68.

74.     Once a voter receives the ballot, he or she can either mail the ballot back to the election administrator's office or place it in a drop box designated by the administrator. Mont. Code §§13-19-306, 307. The ballots must be received before 8pm on Election Day. *Id.* §13-19-306(2).

III.    **Montana's Reponses to COVID-19 and Governor Bullock's Directive Authorizing Universal Vote-By-Mail Statewide.**

75.    Montana initially reacted to COVID-19 much as other states did. On March 12, Governor Bullock issued an Executive Order declaring a state of emergency because of the virus, which he updated the next day in light of the President's emergency declaration. Executive Order No. 2-2020, https://bit.ly/34i3O8I; Executive Order No. 3-2020, https://bit.ly/3iZ9pF4. All of the Governor's actions in response to COVID-19 have been "directives" implementing these emergency orders.

76.    The Governor's first action was to close public schools and to suspend visitations to nursing homes through March 27. He also "strongly recommend[ed] … [l]imiting all gatherings, especially those gatherings of more than 50 people." Shortly thereafter, he extended public-school closures, closed on-premises dining and beverage businesses, and lowered the limit on gatherings to 10 people.

77.    On March 26, the Governor issued a stay-at-home directive for all Montanans unless they were engaging in certain essential activities. He also required non-essential businesses to close, implemented social distancing protocols, and limited non-essential travel.

78.    A month later, Governor Bullock announced that Montana would begin a phased reopening. He explained that "[t]here are very few states in the country that can say they have seen the number of positive cases decline over these past weeks. Montana can say that.… Montana and its hospitals moved swiftly and thoughtfully to respond to the COVID-19 pandemic and the results of this effort is demonstrated by a lower incidence of the virus in Montana when compared to our neighboring states. … [W]e are in the fortuitous position of having a very low viral burden in the state."

79.    The April 22 Directive "establishe[d] guidance applicable to all phases and

provides direction for Phase One." The Governor started Phase One by lifting the stay-at-home order and by reopening non-essential businesses. He also gave "local school boards the flexibility to make decisions about the remainder of the academic year."

80.     On May 8, Governor Bullock expanded Phase One by reopening "pools at licensed public accommodations (hotels, motels, bed and breakfast establishments, tourist homes, etc.)" in addition to gyms, movie theaters, and museums.

81.     Eleven days later, the Governor ordered that Phase Two would begin. He observed that Montana's "efforts have been effective," and he touted that "Montana now has fewer than two dozen active cases and one of the lowest per capita rates of infection in the United States." In a separate statement, the Governor stated that "[a]s a result of the actions we have taken, we have among the lowest number of COVID-19 cases in the nation. Montana also has the lowest number of hospitalizations, per capita, in the nation. We have slowed the spread of this virus and saved lives. These collective actions have allowed us to get to where we are today – to begin a phased reopening of the state."

82.     Because of this success, the Governor allowed "[a]ll businesses [to] operate," and "[r]estaurants, bars, breweries, distilleries and casinos," "[g]yms, indoor group fitness classes, pools, and hot tubs" to "increase to 75 percent capacity." He also opened "[c]oncert halls, bowling alleys, and other places of assembly," and eliminated the "24-person cap per [child-care] facility." He also increased the permissible group gathering size to 50 people "in circumstances that do not readily allow for appropriate physical distancing," but he placed no limit on those events where distancing is possible.

83.     On June 25, the Governor permitted "senior and assisted living facilities [to] allow visitors after giving notice of the recommended safeguards to residents and family members."

84.     A few weeks later, the Governor issued a state-wide mask directive because "[r]ecent research suggests that universal use of face coverings in enclosed public spaces would substantially reduce the spread of COVID-19."

85.     As of August 20, Montana has had a cumulative total of 6,072 cases, only 1,549 of which are active. At least 17 counties are currently reporting cumulative cases in the single digits, and at least 15 counties are reporting no active cases at all.

86.     Montana also has had only 89 deaths total. And at just 8 deaths per 100,000 people, Montana has a lower mortality rate than all but three other states—Alaska, Hawaii, and Wyoming.

87.     Nevertheless, Governor Bullock issued a new directive on August 6 to dramatically change Montana's election procedures less than 90 days before the November general election. Office of the Gov., *Directive Implementing Executive Orders 2-2020 and 3-2020 and Providing for Measures to Implement the 2020 November General Election Safely* (Aug. 6, 2020), https://bit.ly/30VJuId ("Election Directive"). Foremost, the Election Directive "suspend[s]" the election code's explicit prohibition on using universal vote-by-mail procedures for federal elections (Mont. Code §13-19-104(3)), and allows counties to use that process for the upcoming general election. *Id.*

88.     The Election Directive also creates a confusing patchwork of deadlines. For counties that do not opt-in to conduct a universal vote-by-mail election, early in-person absentee voting starts on October 5. For those counties that do opt-in, on the other hand, early in-person absentee voting starts on October 2 *and* ballots are mailed "to every qualified" voter on October 9—regardless of whether the voter wants one or whether the voter intends to vote in person.

89.     To justify all these changes, Governor Bullock stated that it is "unlikely … that traditional in-person voting will not pose a significant risk to public health and human safety." But

that does not comport with how he has treated every other activity in Montana.

90.     The Election Directive is also inconsistent with expert opinion on in-person voting. Recently, Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, said "he believed Americans should be able to safely cast a ballot in-person, so long as they follow necessary social distancing protocols." "Fauci compared the safety of casting a ballot in person to that of an in-person shopping trip to the grocery store in 'counties and cities that are doing it correctly.'" "'They have X's every six or more feet,' he added. 'And it says, "Don't leave this spot until the person in front of you left their spot." And you can do that, if you go and wear a mask, if you observe the physical distancing, and don't have a crowded situation, there's no reason why you shouldn't be able to do that.'"

91.     In fact, even during the height of the pandemic, Wisconsin held in-person elections successfully while also preserving voters' safety. On Election Day in Wisconsin, an estimated 413,000 people voted in person. "Experts said a surge [in coronavirus cases] tied to the election would have appeared in statewide data at the end of April, given the incubation period of the coronavirus. But, no surge appeared." And the Center for Disease Control concluded that "[n]o clear increase in cases, hospitalizations, or deaths was observed after the election." Another study from the American Journal of Public Health similarly concluded that in-person voting in Wisconsin "was a low-risk activity" and that there was "no detectable spike" in COVID-19 cases resulting from the election.

92.     What is most jarring about the Governor's actions, however, is that *he* is running for U.S. Senate as a Democrat in the upcoming election, and it is considered one of the most competitive races this cycle. That means the Governor is unilaterally changing the rules at the last minute to (in the eyes of his own party) sway the election in his own favor. *See supra* ¶40.

93.     And he is speaking out of both sides of his mouth. When it comes to elections, he maintains that COVID-19 is a threat that requires dramatic, last-minute changes that benefit his party and his electoral chances. Yet for every other activity in Montana, the Governor treats COVID-19 as a receding issue, takes credit for Montana's recovery and low incidence rate, and concedes that life is returning to normal.

94.     Perhaps the best example of these inconsistencies came the day *after* he issued the Election Directive, where—in a bid to convince voters he's done a good job—Governor Bullock touted Montana's success against COVID-19 in his debate against Republican Senatorial candidate Steve Daines.

95.     The Governor's inconsistency, coupled with the Election Directive's timing amid a nationwide push by the Democratic Party for the same measures, clearly reveals that the Election Directive is less about protecting the health of Montanans and more about enhancing the Governor's electoral prospects, along with those of his political party.

**IV.     Governor Bullock's Prior Universal Vote-By-Mail Election Directive Facilitated Widespread Problems, Confusion, and Fraud Risks.**

96.     Not only is the Election Directive unnecessary and inconsistent with the Governor's other directives dealing with COVID-19, it is destined to lead to the same problems, confusion, and fraud risks as his prior directive allowing universal vote-by-mail in the primary.

97.     On March 25, the Governor issued a directive that allowed universal vote-by-mail for the June primary and all 56 counties conducted their primary that way. There were many documented problems.

98.     To start with, conducting a universal vote-by-mail election placed strain on election officials. The Missoula County Elections Administrator explained: "One of the things that was a little bit harder with this was that since it was an all mail ballot election, we had a lot of

undeliverable ballots."

99.     Indeed, there were a substantial number of ballots that were sent to the wrong address. In Gallatin County, for example, 4,500 of the 67,507 ballots sent were returned as undeliverable. For its part, Lewis and Clark County had about 1,600 of the 41,000 ballots returned as undeliverable. Despite these problems, the Secretary of State has instructed counties *not* to move voters to the inactive list if their ballot was returned as undeliverable.

100.    Other issues arose as well. For example, a longtime resident of Yellowstone County and her husband "found two Republican ballots, one Green Party ballot and no Democratic Party ballot" when she opened her election envelope. Yellowstone's County Election Administrator said he was aware of 100 such envelopes with an incorrect combination of party ballots in his county alone.

101.    Finally, fully one third of the 603,936 ballots sent out were never returned, meaning over 200,000 ballots left election officials' custody and not only were never voted, but went entirely unaccounted for.

**V.     The Elections Clause and the Electors Clause of the U.S. Constitution Reserve for State *Legislatures* the Power to Regulate Elections.**

102.    The Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." Art. I, §4, cl. 1 (emphasis added). Likewise, the Electors Clause of the U.S. Constitution states that "[e]ach State shall appoint, in such Manner as *the Legislature* thereof may direct, a Number of Electors" for President." Art. II, §1, cl. 2 (emphasis added).

103.    The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley v. Holm*, 285 U.S. 355, 365 (1932). Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for

legislative enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

104.    Because the U.S. Constitution reserves for state *legislatures* the power to set the time, place, and manner of holding elections for Congress and the President, state *executive* officers have no authority to unilaterally exercise that power, much less conflict with existing legislation.

105.    Nor could the authority to ignore existing legislation be delegated to an executive officer. While the Elections Clause "was not adopted to diminish a State's authority to determine its own lawmaking processes," *Ariz. State Legislature*, 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668; *Smiley*, 285 U.S. at 365.

106.    In Montana, the Governor cannot exercise legislative power. "The power of the government of this state is divided into three distinct branches—legislative, executive, and judicial. No person or persons charged with the exercise of power properly belonging to one branch shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted." Mont. Const. art. III, §1. "The legislative power is vested in [the] legislature," Mont. Const. art. V, §1, and the "executive power is vested in the governor who shall see that the laws are faithfully executed," Mont. Const. art. VI, §4. This "separation of powers in the Montana Constitution is 'designed to act as a check on an overly ambitious branch of government.'" *MEA-MFT v. McCulloch*, 291 P.3d 1075, 1080 (Mont. 2012). As a result, "powers belonging to one branch may not be exercised by another." *Id.*

107.    Under no reading of the Montana Constitution could an executive order or directive by the Governor be considered legislation or something that can override existing legislation.

"Since a governor is purely an executive officer, his general authority is narrowly limited by the Constitution." *State ex rel. Bennett v. Bonner*, 214 P.2d 747, 752 (Mont. 1950). "There being no provision of the constitution empowering the governor to make the executive orders in question," the Election Directive is an invalid exercise of authority. *Id.*

108.    If there were any doubt as to whether the Governor can change the state's election laws, the Montana Constitution lays it to rest. It expressly instructs that "[t]he *legislature* shall provide by law the requirements for residence, registration, absentee voting, and administration of elections." Mont. Const. art. 4, §3 (emphasis added). This provision was meant to "insure the purity of elections and guard against abuses of the electoral process." *Id.* As one member of Montana's Constitutional Convention explained:

> This is very broad language which would leave the *Legislature* the power to pass whatever statutes it deems necessary, much as it has in the election laws now, to make sure that there are *no frauds perpetrated upon the people of Montana* in elections. It is purposely kept broad to give the Legislature power to keep the *elections free of fraud*.

Mont. Const. Conv. Tr., Vol. III at 450 (emphasis added). Pursuant to this constitutional provision, the Montana State Legislature has outlined "the mechanics of the election process" in Title 13 of the Montana Code, *see Wheat v. Brown*, 85 P.3d 765, 770-71 (Mont. 2004), including its explicit prohibition on universal vote-by-mail in federal elections in Title 13, Mont. Code §13-19-104(3)(a).

109.    Thus, the Election Directive's attempt to suspend and rewrite Title 13 of the Montana code is a legal nullity.

110.    But even if the Legislature could, under the Montana Constitution, give the Governor carte blanche to override duly enacted election laws, the statutes cited by Governor Bullock as the source of authority for Election Directive do not do so.

111.    Governor Bullock claims the authority to discount valid legislation from Montana Code Sections 10-3-104(2)(a) and 10-3-104(2)(c).

112.    Section 10-3-104(2)(a) authorizes the Governor to "suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or orders or rules of any state agency if the strict compliance with the provisions of any statute, order, or rule would in any way prevent, hinder, or delay necessary action in coping with the emergency or disaster."

113.    The Election Directive does not fall within the scope of §10-3-104(2)(a). It instead exceeds the statute's scope in several ways. First, the Election Directive does not fall within the Governor's power to suspend statutes to "regulatory statute[s] prescribing the procedure for conduct of state business." Mont. Code §10-3-104(2)(a). Election laws are neither a "regulatory statute" nor a "statute prescribing the procedure for conduct of state business."

114.    "Generally, a 'regulatory statute' is the result of the exercise of the state's police power to enact regulations to promote the public health, morals or safety, and the general well-being of the community." *See Com. v. CSX Trans., Inc.*, 639 A.2d 1213, 1214 (Pa. Super. Ct. 1994). That is certainly true in Montana. *See, e.g.*, *Mark Ibsen, Inc. v. Caring for Montanans, Inc.*, 371 P.3d 446, 455 (Mont. 2016) (using Montana's Unfair Trade Practices Act as an example of a "regulatory statute"); *State v. Folda*, 885 P.2d 426, 428 (Mont. 1994) (using motor-vehicle statutes as examples of "regulatory statutes"); *Oldenburg v. Flathead Cty. By & Through its Bd. of Cty. Comm'rs*, 676 P.2d 778, 778 (Mont. 1984) (using zoning licensing as examples of "regulatory statutes"); *Langen v. Badlands Co-op. State Grazing Dist.*, 234 P.2d 467, 468 (Mont. 1951) (laws governing the Montana Grass Conservation Commission are "regulatory statutes"). To that end, regulatory statutes are "public service laws" and govern the issuing of licenses and the regulation of business and public utilities to protect and "serve the public more efficiently." *Interstate Transit*

*Co. v. Derr*, 228 P. 624, 626 (Mont. 1924); *see N. Pac. Ry. Co. v. Bennett*, 272 P. 987, 991 (Mont. 1928).

115.    Election laws are not regulatory statutes. Although some states broadly purport to permit the governor to suspend *any* state law, *see, e.g.*, Alaska Code §31-9-13; Md. Code, Pub. Safety §14-107(d)(1)(i); N.Y. Exec. Law §29-a; Va. Code §44-146.17; *see also* Utah Code §53-2a-209 (allowing the governor to suspend any statute except for those establishing felonies), Montana provides no such power.

116.    Even if election laws could be classified as "regulatory" statutes, the statutes at issue here are still not ones "prescribing the procedures for conduct of state business" during an emergency. In emergencies, Montana law gives the Governor powers, such as Section 10-3-104, to get rid of roadblocks that slow government responsiveness to a particular crisis "in order to provide for prompt and timely reaction to an emergency or disaster," Mont. Code §10-3-101. Specifically, §10-3-104(a) allows the Governor to cut through red tape by suspending *procedures* that would ordinarily and directly slow or delay government action. For example, Governor Bullock temporarily suspended "hours of service" regulations as applied to "drivers of commercial motor vehicles while transporting fuel and other fire suppression resources" in an emergency declaration to combat the North Hills Wildfires. *See* Office of the Gov., E.O. No. 10-2019, Executive Order Declaring a State of Energy Emergency to Meet Demand for Aviation Fuel and Other Fire Suppression Resources (July 28, 2019), https://bit.ly/2Y3Qa53.

117.    The entire election code is not a "procedure" that functions as an administrative hurdle over which the state must ordinarily climb in order to act in the interest of public health. Indeed, the fact that Governor Bullock could not merely *suspend* the election laws, but also had to affirmatively rewrite them to create a brand new regime—such as allowing in-person voting and

universal vote-by-mail to happen at the same time—is evidence that the elections laws are not a mere "procedure" covered by the statute.

118.     Moreover, *federal* elections are not "state business" under Section 10-3-104(2)(a). State business refers to the functioning of state government. *See, e.g.*, Mont. Code §2-18-501 (mandating that elected state officials and other state employees be reimbursed for expenses while "engaged in official state business"); *id.* §2-17-421 (mandating that state officers and employees may not be compensated for driving a personal motor vehicle unless "on state business").

119.     Second, in order to exercise the limited power granted by Section 10-3-104(2)(a) to suspend statutes, Governor Bullock must determine that "strict compliance with the provisions of [the statute] would in any way prevent, hinder, or delay necessary action in coping with the emergency." Mont. Code §10-3-104(2)(a). While this language grants the Governor discretion, it does not grant him a blank check.

120.     Governor Bullock's own decisions establish that the November elections will not "prevent, hinder, or delay necessary action" regarding COVID-19. Under his direction, the state has almost fully reopened. Montana has been in Phase Two of reopening for three months and by its own account leads the nation in successful response to COVID-19. *See supra* ¶¶81-86. And the Election Directive provides that in-person voting will still occur, and it provides measures for "safe registration and voting" in the election, which undermines the Governor's rationale for universal by-mail voting.

121.     Governor Bullock's conclusory assertion that strict compliance with existing election laws in November would hinder mitigation of COVID-19 was arbitrary and capricious. The Election Directive contains a boilerplate statement that "reliance on typical election procedures for the general election would prevent, hinder, or delay necessary action in coping with

the emergency," but it does not state or even intimate that any election laws—save those that pertain to in-person voting—threaten to spread COVID-19. Even still, the fact that the Governor allows in-person voting to continue contradicts the very notion that it cannot be done safely and effectively. And as the Election Directive acknowledges, Montana already has a system set up for people to vote by mail. Voters must simply submit an application in order to receive an absentee ballot. Mont. Code §13-13-201.

122.    To the extent that Governor Bullock has determined that the ordinary process of applying for vote-by-mail ballots would cause people to act in a way that hindered the mitigation of the heath crisis, he could have ordered that vote-by-mail *applications* (not ballots) be sent to all registered voters without suspending any statute.

123.    Governor Bullock's claims of authority under Section 10-3-104(2)(c) to nullify valid legislation are even weaker. Section 10-3-104(2)(c) suffers from all of the defects of Section 10-3-104(2)(a), and in addition doesn't even purport to give the Governor power to suspend *any* laws.

124.    Finally, the statutory provisions the Governor relies on allow the Governor to suspend state statutes, not the state Constitution. Because the Montana Constitution unambiguously instructs that "[t]he *legislature* shall provide by law the requirements for residence, registration, absentee voting, and administration of elections," Mont. Const. art. 4, §3 (emphasis added), Sections 10-3-104(2)(a) and (2)(c) should not be read to allow the Governor to suspend election-integrity measures. *State v. Dixon*, 998 P.2d 544, 546-47 (Mont. 2000) ("It is the duty of courts, if possible, to construe statutes in a manner that avoids unconstitutional interpretation.").

125.    The Legislature cannot give the Governor the power to frustrate its constitutional mandate. Indeed, the Supreme Court has never held "that a state legislature may prescribe

regulations on the time, place, and manner of holding federal elections in defiance of provisions of the State's constitution." *Ariz. State Legislature*, 135 S. Ct. at 2673.

126.     In sum, the Elections Clause and the Electors Clause both vest the state Legislature with the power to legislate the manner of elections and the selection of electors; that power cannot be delegated in blanket fashion. But in any event, none of the statutes cited by the Election Directive purports to delegate to the Governor the power to legislate.

### VI.     The Fourteenth Amendment to the U.S. Constitution Prohibits Practices that Promote Fraud and Dilute Valid Votes.

127.     The Fourteenth Amendment of the U.S. Constitution protects the "the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 77 U.S. 533, 554 (1964). "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555 n.29 (quoting *South v. Peters,* 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

128.     Both direct denials and practices that otherwise promote fraud and dilute the effectiveness of individual votes, thus, can violate the Fourteenth Amendment. *See id.* at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

129.     *"*Every voter in a federal … election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962).

130.     Fraudulent votes "debase[]" and "dilute" the weight of *each* validly cast vote. *See*

*Anderson*, 417 U.S. at 227. When it comes to "'dilut[ing] the influence of honest votes in an election,'" whether the dilution is "'in greater or less degree is immaterial'"; it is a violation of the Fourteenth Amendment. *Id.* at 226.

131.    The Fourteenth Amendment does not tolerate actions such as those in the Election Directive because automatically sending *ballots* (as opposed to applications for ballots) to *all* persons (or rather, to all *names*) registered to vote makes fraud and other forms of illegal voting inevitable. *See supra* Section I.

132.    Ample evidence from Nevada, New Jersey, and other jurisdictions demonstrates that voter fraud—or even inadvertent double voting or non-fraudulent illegal voting—is guaranteed when hundreds of thousands of ballots are indiscriminately distributed, regardless of whether a real, eligible, present, or desiring person exists to receive them. This is especially true where, as here, counties will mail ballots to addresses where they *know* the voter doesn't live there. *See supra* ¶99.

133.    When citizens are denied the right to vote in this way, the validity of the electoral process crumbles. Voters lose their constitutional rights. Candidates are injured by invalid election returns. And parties must divert time and resources to educate voters, get out of the vote, and encourage voters not to lose their faith in the system.

## CAUSES OF ACTION

### COUNT I
### Violation of the Elections Clause (42 U.S.C. § 1983)

134.    Plaintiffs incorporate all their prior allegations.

135.    The Election Directive changes the time, place, and manner in which Montanans will participate in the November 3, 2020 congressional election.

136.    Defendants are not "the Legislature," and therefore have no power under the

Elections Clause to determine the time, place, or manner of congressional elections. *See* U.S. Const. art. I, §4.

137.    The Legislature could not, and did not, delegate to the Governor the power to suspend and re-write the state's election laws.

138.    Even on its own terms, Section 10-3-104(2) does not authorize the actions taken in the Election Directive.

139.    The Election Directive thus violates the Elections Clause of the U.S. Constitution.

140.    Defendants have acted and will continue to act under color of state law to violate the Elections Clause.

141.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Election Directive.

## COUNT II
### Violation of the Electors Clause (42 U.S.C. § 1983)

142.    Plaintiffs incorporate all their prior allegations.

143.    The Election Directive changes the manner in which Montana will appoint electors during the November 3, 2020 presidential election.

144.    Defendants are not "the Legislature," and therefore have no power under the Electors Clause to determine the manner in which Montanans will appoint electors. *See* U.S. Const. art. II, §1.

145.    The Legislature could not, and did not, delegate to the Governor the power to suspend or alter the state's election laws.

146.    Even on its own terms, Section 10-3-104(2) does not authorize the actions taken in the Election Directive.

147.     The Election Directive thus violates the Electors Clause of the U.S. Constitution.

148.     Defendants have acted and will continue to act under color of state law to violate the Electors Clause.

149.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Election Directive.

**COUNT III**
**Violation of the Right to Vote (42 U.S.C. § 1983)**

150.     Plaintiffs incorporate all their prior allegations.

151.     The Election Directive, which upends validly enacted election law and requires automatic mailing of ballots to all registered voters makes voter fraud and other ineligible voting inevitable.

152.     Dilution of honest votes, to any degree, by the casting of fraudulent or illegitimate votes violates the right to vote. *Reynolds*, 377 U.S. at 555; *Anderson*, 417 U.S. at 226-27; *Baker*, 369 U.S. at 208.

153.     Defendants' new, unauthorized voting system facilitates fraud and other illegitimate voting practices, and therefore violates the Fourteenth Amendment to the U.S. Constitution.

154.     Defendants have acted and will continue to act under color of state law to violate the Fourteenth Amendment.

155.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Election Directive.

**WHEREFORE,** Plaintiffs ask this Court to enter judgment in their favor and provide the

following relief:

   a.  A declaratory judgment that the Election Directive violates the Elections Clause, the

       Electors Clause, and the Fourteenth Amendment.

   b.  A permanent injunction prohibiting Defendants from implementing and enforcing the

       Election Directive;

   c.  A temporary restraining order and preliminary injunction granting the relief specified

       above during the pendency of this action;

   d.  Plaintiffs' reasonable costs and expenses, including attorneys' fees; and

   e.  All other preliminary and permanent relief that Plaintiffs are entitled to, and that the

       Court deems just and proper.


Dated: September 2, 2020                        Respectfully submitted,


                                                 _/s/ James Brown_
                                                James Brown (MT No. 8916)
                                                THE JAMES BROWN LAW OFFICE, PLLC
                                                30 South Ewing Street, Suite 100
                                                Helena, Montana 59601
                                                Ph.: (406) 925-1745
                                                Email: jim@thunderdomelaw.com

                                                Thomas R. McCarthy*
                                                Tyler R. Green*
                                                Bryan Weir*
                                                Cameron T. Norris*
                                                CONSOVOY MCCARTHY PLLC
                                                1600 Wilson Boulevard, Suite 700
                                                Arlington, VA 22209
                                                Ph.: (703) 243-9423
                                                Email: tom@consovoymccarthy.com

                                                * Motion for admission
                                                pro hac vice forthcoming