Peter M. Meloy, MT Bar No. 1035
MELOY LAW FIRM
P.O. Box 1241
Helena, Montana 59624
Tel: (406) 442-8670
mike@meloylawfirm.com

Abha Khanna, *pro hac vice*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Tel: (206) 359-8000
akhanna@perkinscoie.com

*Attorneys for Intervenor-Defendants*
*DSCC, DCCC, and Montana Democratic*
*Party*

UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC.; REPUBLICAN NATIONAL COMMITTEE; NATIONAL REPUBLICAN SENATORIAL COMMITTEE; MONTANA REPUBLICAN STATE CENTRAL COMMITTEE, | Case No.: 6:20-cv-00066-DLC **INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiffs, | |
| and | |
| GREG HERTZ, in his official capacity as Speaker of the House of Representatives of Montana; SCOTT SALES, in his official capacity as President of the Montana State Senate, | |

Intervenor-
Plaintiffs,

v.

STEPHEN BULLOCK, in his official
capacity as Governor of Montana;
COREY STAPLETON, in his official
capacity as Secretary of State of
Montana,

Defendants,

and

DSCC; DCCC; MONTANA
DEMOCRATIC PARTY,

Intervenor-
Defendants.

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................1

II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY ......................2

III.   LEGAL STANDARD...........................................................................7

IV.    ARGUMENT .....................................................................................8

   A.    Plaintiffs cannot succeed on the merits....................................................9

   1.   This Court does not have the authority to enter the requested relief.........9

      a.   Plaintiffs' claims are barred by the Eleventh Amendment................9

      b.   Plaintiffs have not established standing............................................10

   2.   Plaintiffs cannot succeed on the merits of their Elections or Electors
        Clause Claim. ........................................................................................10

   B.    The equitable factors do not support issuance of an injunction.................16

   1.   Plaintiffs will suffer no injury absent an injunction. ..............................17

   2.   The balance of harms weighs strongly in favor of Defendants. ..............22

   3.   The public interest would not be served by an injunction. ......................26

V.    CONCLUSION..................................................................................27

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*All. for Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ............................................................17

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015)...............................................................10, 13

*Carmel Valley Fire Prot. Dist. v. State*,
  20 P.3d 533 (Cal. 2001)..........................................................12

*Common Cause/Ga. v. Billups*,
  439 F. Supp. 2d 1294 (N.D. Ga. 2006)..............................................26

*Cook Cnty. Republican Party v. Pritzker*,
  No. 20-cv-4676, (N.D. Ill. Sept. 17, 2020)...................................passim

*Cottonwood Env't Law Ctr. v. U.S. Sheep Experiment Station*,
  No. CV 17-155-M-DLC, 2019 WL 3290994 (D. Mont. July 22,
  2019) ............................................................................8

*Democratic Nat'l Comm. v. Hobbs*,
  948 F.3d 989 (9th Cir. 2020) (en banc) ...........................................21

*Driscoll v. Stapleton*,
  No. DV 20-408 (Mont. Jud. Dist. Ct. May 22, 2020) ...............................22

*Fla. Democratic Party v. Scott*,
  215 F. Supp. 3d 1250 (N.D. Fla. 2016) ...........................................25

*In re Abbott*,
  954 F.3d 772 (5th Cir. 2020) .....................................................15

*League of Wilderness Defs./Blue Mountains Biodiversity Project v.
  Connaughton*,
  752 F.3d 755 (9th Cir. 2014) .....................................................26

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) .................................................25, 26

*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) ..................................................7, 28

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Lopez v. Candaele*,
  630 F.3d 775 (9th Cir. 2010) ..................................................................10

*MEA-MFT v. McCulloch*,
  291 P.3d 1075 (Mont. 2012).............................................................11, 12

*Metabolife Int'l, Inc. v. Wornick*,
  264 F.3d 832 (9th Cir. 2001) .................................................................20

*Montanans for Cmty. Dev. v. Motl*,
  54 F. Supp. 3d 1153 (D. Mont. 2014) ...................................................8, 9

*One Wis. Inst., Inc. v. Thomsen*,
  198 F. Supp. 3d 896 (W.D. Wis. 2016) ..................................................25

*Paher v. Cegavske*,
  No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813 (D. Nev. Apr.
  30, 2020) ..................................................................................22, 24, 27

*Paher v. Cegavske*,
  No. 3:20-cv-00243-MMD-WGC, 2020 WL 2748301 (D. Nev. May
  27, 2020) ..............................................................................................22

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984)..................................................................................9

*People First of Ala. v. Sec'y of State*,
  815 F. App'x 505 (11th Cir. 2020)..........................................................21

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006)...................................................................................17

*Serv. Emps. Int'l Union, Local 1 v. Husted*,
  906 F. Supp. 2d 745 (S.D. Ohio 2012)....................................................25

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008)...............................................................................13

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982)...............................................................................16

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)..................................................................................passim

*Witherall v. Bell*,
   No. CV 17-00038-GF-BMM-JTJ, 2017 WL 9330069 (D. Mont.
   Nov. 6, 2017) .......................................................................................8

## STATUTES

Mont. Code. Ann § 10-3-104...............................................................passim

Mont. Code Ann. § 13-13-118....................................................................27

Mont. Code Ann. § 13-13-119....................................................................27

Mont. Code Ann. § 13-19-104....................................................................11

Mont. Code Ann. § 13-19-106......................................................................6

Mont. Code Ann. § 13-35-205....................................................................27

Mont. Code Ann. § 13-35-207....................................................................27

Mont. Code Ann. § 13-35-208....................................................................27

Mont. Code Ann. § 13-35-210....................................................................27

Mont. Code Ann. § 13-35-218....................................................................27

## OTHER AUTHORITIES

U.S. Const. amend. XI .......................................................................passim

U.S. Const. amend. XIV ............................................................................7

Mont. Const. art. IV, § 3 ..........................................................................12

Mont. Const. art. VI, § 4 ..........................................................................11

## MEMORANDUM OF LAW

Intervenor-Defendants DSCC, DCCC, and Montana Democratic Party submit this memorandum of law in opposition to Plaintiffs' Motion for Preliminary Injunction.

## I.   INTRODUCTION

Plaintiffs are litigating against reality. They would have this Court believe that an epidemic of voter fraud is sweeping across the United States; that the ongoing coronavirus pandemic is a trivial concern requiring no remediation from state officials; that proactively mailing ballots to Montanans—who overwhelmingly voted by mail even before the pandemic—will cause mass confusion and disruption; and that the State's decision to honor a request made by a bipartisan collection of local election officials constitutes a brash and undemocratic power grab. None of this is true. What Plaintiffs' variously and inaccurately characterize as both a "knee-jerk reaction" and a concerted, "brazen" attempt to "sway the election," *see* Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction ("Mot."), ECF No. 9, at 1, 18, is actually a commonsense exercise of statutorily granted executive power, made in response to a request from local officials charged with implementing the State's election laws during a global health crisis.

Even if Plaintiffs' claims were premised on something more than tall tales and hokum, they have fallen well short of the high burden required for the extraordinary

remedy of preliminary injunctive relief. They cannot succeed on the merits of their claims, which are not only wrong as a matter of law, but also precluded by Article III and the Eleventh Amendment. The evidence they have marshaled does not demonstrate widespread voter fraud, or a threat to electoral integrity in Montana, or *any* actual injury that justifies injunctive relief. By striking contrast, Plaintiffs' requested relief *will* result in widescale disruption ahead of the November election, and *will* cause voters to suffer disenfranchisement. Balanced against each other, the equitable considerations independently counsel against the requested relief.

Ultimately, Defendants have acted reasonably, and in concert with local officials, to ensure that all voters can cast ballots this November. Plaintiffs should not be permitted to secure an injunction to upend Defendants' plans for the general election—and, in so doing, suppress the votes of eligible Montanans and put the health and safety of the electorate at risk—when they have fallen far short of the considerable showing required for the extraordinary relief they seek. For these reasons and those that follow, Intervenor-Defendants respectfully request that Plaintiffs' motion be denied.

## II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

In response to the growing pandemic, Defendant Stephen Bullock, the Governor of Montana (the "Governor"), declared a state of emergency on March 12, 2020. *See Executive Order No. 2-2020*, Office of Gov. (Mar. 12, 2020), https://

governor.mt.gov/Portals/16/docs/2020EOs/EO-02-2020_COVID-19%20Emergency%20Declaration.pdf?ver=2020-03-13-103433-047; *Executive Order No. 3-2020*, Office of Gov. (Mar. 13, 2020), https://governor.mt.gov/Portals/16/docs/2020EOs/EO-03-2020_Amending%20COVID-19%20Emergency%20Declaration.pdf?ver=2020-03-18-114433-983.  Two weeks later, recognizing that "the Centers for Disease Control and Prevention has urged states to '[e]ncourage voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations,'" and after "consult[ing] with public health experts and emergency management professionals," the Governor exercised the authority granted to him by Montana Code Annotated Section 10-3-104—the same statutory basis challenged in this suit—to make voting safer during the State's June 2 primary election (the "June Primary"). *Directive Implementing Executive Orders 2-2020 and 3-2020 and Providing for Measures to Implement the 2020 June Primary Election Safely* at 1–2, Office of Gov. (Mar. 25, 2020), http://governor.mt.gov/Portals/16/Directive%20on%20Elections.pdf?ver=2020-03-26-102626-610. The directive "permit[ted] counties, at their local discretion, to expand access to mail voting procedures *and* early voting," and also "require[d] additional measures by all counties, regardless of their voting procedures, to ensure appropriate social distancing and make voting and voter registration safer for all Montanans." *Id.* at 2.

All 56 Montana counties opted to conduct a mail-based primary. *See* Perrin Stein, *Montana Allows Counties to Hold All-Mail Election in November*, Bozeman Daily Chron. (Aug. 6, 2020), https://www.bozemandailychronicle.com/coronavirus/montana-allows-counties-to-hold-all-mail-election-in-november/article_6d071c53-850e-5e59-ab58-466bc9e9d704.html. The result was record turnout. *See* Tom Lutey, *Montana Voters Set Primary Voting Record*, Billings Gazette (June 1, 2020), https://billingsgazette.com/news/state-and-regional/montana-voters-set-primary-voting-record/article_b253318c-8a5d-5deb-bc85-8c93d3004734.html.

On July 24, 2020, the Montana Association of Counties and the Montana Association of Clerk & Recorders/Election Administrators (the "Associations") dispatched a letter to the Governor hailing the June Primary directive as a success. *See* Ex. 1. The letter noted that the mail-based primary "was streamlined, accurate, and as safe as possible under the current pandemic," and given that "[m]ost Montana counties have about 14 years of experience in conducting mail ballot elections," "the decision to conduct the Primary Election via mail ballot was a proactive approach that showcased Montana in a very good light." *Id* at 1.

The letter went on to lay out the concerns that local election officials have regarding conduct of the November Election. The Associations noted that accommodating normal demand for in-person polling locations would be

challenging in November because Montana's election judges, who are required for administering polling locations, "are primarily in the demographic of concern for mortality." *Id.* at 4. And "[c]ounties are losing polling place venues, so they will be required to consolidate polling locations." *Id.* at 4–5. The letter concluded as follows:

> Given we are unsure of how long the pandemic will last, Montana's Clerk & Recorders/Election Administrators want to (and absolutely should be) prepared for the worst, especially given that elections require numerous election judges and enormous groups of people.

> We formally request that Counties be given the option to conduct the 2020 General Election by mail and, as with the 2020 Primary, also afford those who wish to vote in person that option as well, to ensure that all eligible residents are able to exercise their right to vote.

*Id.* at 8.

On August 6, the Governor responded by issuing a directive allowing counties to again opt in to a primarily vote by mail system for the November Election (the "Election Directive"). *See Directive Implementing Executive Orders 2-2020 and 3-2020 and Providing for Measures to Implement the 2020 November General Election Safely* ("Election Directive"), Office of Gov. (Aug. 6, 2020), https://covid19.mt.gov/Portals/223/Documents/2020-08-06_Directive%20-%20November%20Elections.pdf?ver=2020-08-06-112431-693. The Election Directive—which is virtually identical to the June Primary directive—permits counties to opt in to conducting the November Election "under the mail ballot

provisions of Title 13, Chapter 19" of the Montana Code, *id.* at 3, which requires, among other provisions, that "[a]n official ballot must be mailed to every qualified elector." Mont. Code Ann. § 13-19-106(2). While counties are still permitted to offer in-person voting, the overall effect of the Election Directive is "to shift the default position from voting in person to voting by mail" for the November Election. Election Directive at 2. For voters, the upshot of the Election Directive is to eliminate the application requirement to receive a ballot by mail.

The Governor explained his decision to issue the Election Directive as one driven by the public health crisis: "It is increasingly unlikely that the pandemic will have fully abated by November such that traditional in-person voting will not pose a significant risk to public health and human safety." *Id.* at 2. The Election Directive explicitly follows the successful June Primary design, which "[c]ounty election administrators adeptly managed" and resulted in "an increase in voter turnout compared to previous primary elections." *Id.* at 1. Given that the June Primary "successfully maximized safety and Montanans' opportunity to vote," *id.* at 2, it is not surprising that the vast majority of counties—45 of 56—have opted in to the Election Directive's vote by mail system. *See Montana Counties Submitting a Mail Ballot Plan for the 2020 General Election*, Mont. Sec'y of State, https://sosmt.gov/ wp-content/uploads/Counties_Mail_Ballot_General.pdf. These 45 counties are home to 94 percent of the State's registered voters. *See Official Election Results*,

Mont. Sec'y of State, https://sosmt.gov/elections/results (follow "Voter Registration by County" hyperlink) (last visited Sept. 17, 2020).

Nearly four weeks later, Plaintiffs initiated this suit, alleging that the Election Directive is an impermissible exercise of executive authority that violates the U.S. Constitution's Elections and Electors Clauses, and that it will lead to voter fraud and vote dilution in violation of the Fourteenth Amendment. *See generally* Complaint for Declaratory and Injunctive Relief ("Compl."), ECF No. 1. That same day, Plaintiffs moved for a preliminary injunction as to only Counts I and II of their Complaint. *See generally* Mot. Subsequently, the Court granted intervention to Intervenor-Plaintiffs. *See* ECF No. 35.[1]

## III.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *accord Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) ("A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam))).

The party requesting an injunction must demonstrate (1) a likelihood of

---

[1] Intervenor-Plaintiffs joined Plaintiffs' Motion for Preliminary Injunction, but did not supply any additional points of law or fact. *See* ECF No. 39.

success on the merits, (2) a likelihood of irreparable harm absent injunctive relief, (3) that the balance of equities tips in the party's favor, and (4) that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. "Plaintiffs must satisfy all four *Winter* prongs in order to secure an injunction." *Cottonwood Env't Law Ctr. v. U.S. Sheep Experiment Station*, No. CV 17-155-M-DLC, 2019 WL 3290994, at *1 (D. Mont. July 22, 2019). Plaintiffs cannot demonstrate likely success on the merits if they fail to establish standing, *see, e.g.*, *Montanans for Cmty. Dev. v. Motl*, 54 F. Supp. 3d 1153, 1157 (D. Mont. 2014), or to state a claim upon which relief can be granted, *see, e.g.*, *Witherall v. Bell*, No. CV 17-00038-GF-BMM-JTJ, 2017 WL 9330069, at *8 (D. Mont. Nov. 6, 2017).

## IV.   ARGUMENT

Plaintiffs argue that the Election Directive constitutes "a direct usurpation of the Legislature's authority" that "violates both the Elections Clause and Electors Clause of the U.S. Constitution." Mot. at 1. Based on this claim, Plaintiffs ask this Court to enjoin enforcement of the Election Directive and order state officials to comply with Montana law. This Court cannot and should not grant this relief for three reasons. First, threshold jurisdictional issues—namely, the Eleventh Amendment and standing—preclude this Court from considering the requested injunction. Second, because Montana law vests the Governor with authority to issue the Election Directive, Plaintiffs cannot succeed on the merits of their Elections or

Electors Clause claim. And third, even if this Court had jurisdiction and Plaintiffs stated a viable claim for relief, the equitable considerations militate strongly against a preliminary injunction.

### A.      Plaintiffs cannot succeed on the merits.

#### 1.      This Court does not have the authority to enter the requested relief.

Before considering the merits of Plaintiffs' request for a preliminary injunction, this Court must resolve threshold issues implicating its power to enter the requested relief. *See, e.g.*, *Montanans for Cmty. Dev.*, 54 F. Supp. 3d at 1157.

##### a.      Plaintiffs' claims are barred by the Eleventh Amendment.

As discussed in Part IV.A of Intervenor-Defendants concurrently filed Brief in Support of Consolidated Motion for Judgment on the Pleadings and Motion to Dismiss ("Motion to Dismiss"), *see* ECF No. 73 at 6–10, which Intervenor-Defendants incorporate by reference here in its entirety, the Eleventh Amendment bars this Court's exercise of judicial power to issue Plaintiffs' requested relief because a federal court cannot order state officials to conform to state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Therefore, the Court cannot adjudicate Counts I and II, and Plaintiffs cannot succeed on the merits of these claims.

### b.    Plaintiffs have not established standing.

"[A]t the preliminary injunction stage, a plaintiff must make a 'clear showing' of his injury in fact." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Winter*, 555 U.S. at 7). For the reasons discussed at length in Part IV.B–C of Intervenor-Defendants' Motion to Dismiss, *see* ECF No. 73 at 10–19, neither Plaintiffs nor Intervenor-Plaintiffs have standing to bring their claims, and therefore a preliminary injunction cannot be issued.

### 2.    Plaintiffs cannot succeed on the merits of their Elections or Electors Clause Claim.

Even if this Court could adjudicate Plaintiffs' Elections and Electors Clause claims, they fail as a matter of law.

As discussed in Part IV.D.1 of Intervenor-Defendants' Motion to Dismiss, *see* ECF No. 73 at19–21, the U.S. Supreme Court has held that, under the Elections and Electors Clauses, state legislatures can delegate regulation of federal elections to state officials like the Governor. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 807 (2015). And because the Governor's actions to expand voting opportunities through the Election Directive were authorized by Montana law—specifically, Montana Code Annotated Section 10-3-104, which authorizes the Governor to "suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business . . . if [] strict compliance . . . would in any way prevent, hinder, or delay necessary action in

coping with [an] emergency or disaster"—the Election Directive does not violate the

Elections or Electors Clause. It is instead a proper exercise of statutorily authorized

executive authority. Consistent with Montana Code Annotated Section 10-3-104, it

temporarily suspends certain provisions of Montana's election laws—most notably,

Montana Code Annotated Section 13-19-104(3), which would otherwise preclude

conducting a mail election during a regularly scheduled federal, state, or county

election.

In response to this straightforward exercise of powers granted by the

Legislature, Plaintiffs attempt to muddy the waters by imposing novel limitations on

the Governor's emergency powers. Ultimately, none of these arguments is

compelling, and certainly none demonstrates that the Governor exceeded his lawful

authority.

*First*, Plaintiffs suggest that, in issuing the Election Directive, the Governor

has engaged in impermissible legislating. *See* Mot. at 11–13. He has not. The

Governor has simply exercised the emergency powers *granted to him by statute* to

suspend certain election laws in response to a public health crisis. Such actions

"plainly entail[] execution of the law and are thus consistent with executive branch

functions that are routinely required to implement legislative enactments." *MEA-

MFT v. McCulloch*, 291 P.3d 1075, 1080 (Mont. 2012); *see also* Mont. Const. art.

VI, § 4 ("The executive power is vested in the governor who shall see that the laws

are faithfully executed."). Because "[t]he Executive branch is ultimately the responsibility of the Governor," *MEA-MFT*, 291 P.3d at 1080, his execution of Section 10-3-104 is wholly consistent with his proper executive functions—and wholly distinct from legislative actions that he cannot undertake. The Governor has *not*, Plaintiffs' assertions to the contrary notwithstanding, invaded the Legislature's province by providing "the requirements for residence, registration, absentee voting, and administration of elections." Mont. Const. art. IV, § 3. Instead, the Election Directive simply suspends—*temporarily*, *see* Election Directive at 2 ("This Directive applies only to the 2020 general election.")—certain regulations governing the conduct of elections, as permitted by Section 10-3-104. *Cf. Carmel Valley Fire Prot. Dist. v. State*, 20 P.3d 533, 539 (Cal. 2001) (noting that California Constitution's separation of powers does not "prohibit one branch from taking action properly within its sphere that has the *incidental* effect of duplicating a function or procedure delegated to another branch" so long as it does not "exercis[e] the *complete* power constitutionally vested in another" (quoting *Younger v. Superior Court*, 577 P.2d 1014, 1024 (Cal. 1978))).

*Second*, Plaintiffs contend that the Election Directive exceeds the scope of Section 10-3-104 because "[e]lection laws are [neither] regulatory statutes" nor procedures for conducting state business. *See* Mot. at 13–15. But Plaintiffs do not provide *any* persuasive authority for these assertions. They merely list a series of

cases in which other statutes have been deemed "regulatory," *see id.* at 13–14, but none of these cases limit the definition of a regulatory statute, suggest that election laws are not regulatory, or in any way imply that election laws are outside the scope of the Governor's emergency powers. Plaintiffs also give examples of *other* actions undertaken by the Governor in response to emergencies, *see id.* at 14–15, but cite no limiting authority holding that *only* such actions are permitted under Section 10-3-104. This is not surprising, given that the statutory text grants the Governor broad authority to suspend "*any* regulatory statute" that "would in *any* way" hinder an emergency response. Mont. Code. Ann § 10-3-104(2)(a) (emphases added).[2] Plaintiffs cannot conclusorily dismiss election statutes as beyond the scope of Section 10-3-104 without any persuasive authority, especially since the U.S. Supreme Court has repeatedly emphasized that the conduct of elections—both state *and* federal—is quintessential state business. *See, e.g.*, *Ariz. State Legislature*, 576 U.S. at 816–18; *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).

---

[2] Indeed, the expansiveness of this statute—and its potential application to address election procedures during emergencies—was highlighted by Professor Michael T. Morley, an academic on whom Plaintiffs rely in their Complaint and Motion. *See* Michael T. Morley, *Election Emergencies: Voting in the Wake of Natural Disasters and Terrorist Attacks*, 67 Emory L.J. 545, 609–10 & n.424 (2018) (observing that such statutes "leave governors to determine the appropriate response in the midst of an actual emergency, while protecting the public from imminent threats and remediating myriad other consequences of a disaster").

*Third*, Plaintiffs suggest that the Election Directive is inappropriate because the ongoing pandemic does not justify expansion of mail voting. *See* Mot. at 16–17. This blasé and cavalier characterization of the public health crisis is not only dangerous, but also wholly unsupported by Plaintiffs with any medical evidence. Instead, medical experts agree that the pandemic will still constitute a significant public health crisis in November, and the Election Directive is a reasonable response aimed at reducing the need for in-person voting.[3] Numerous medical authorities have concluded that a second wave of COVID-19 is expected in the fall. *See, e.g.*, Lisa Lockerd Maragakis, *First and Second Waves of Coronavirus*, Johns Hopkins Med., https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/first-and-second-waves-of-coronavirus (Aug. 14, 2020). The Centers for Disease Control and Prevention have catalogued the risks posed by the coronavirus to both voters and election volunteers at in-person polling locations, *see Considerations for*

---

[3] Plaintiffs contend that because the Election Directive "allows in-person voting to continue," it is inherently inconsistent. Mot. at 16. But this interpretation ignores that the purpose of the Election Directive is to *limit* in-person voting in light of the risks it poses, *see* Election Directive at 1—a goal that will be achieved by expanding the availability of mail ballots. Indeed, that voters in counties that opt in to the mail voting system have options—to either vote by mail *or* vote in person at locations with reduced usage—is a feature, not a bug, of the Election Directive. *See Cook Cnty. Republican Party v. Pritzker*, No. 20-cv-4676, slip op. at 21 (N.D. Ill. Sept. 17, 2020), ECF No. 59 ("[T]he legislature's judgment to enact additional measures to encourage voting by mail during a pandemic facilitates the state interest of limiting crowds at polling places for those who are comfortable voting in person while providing a viable alternative for those who are not.").

*Intervenor-Defendants' Opposition to Motion for Preliminary Injunction—14*

*Election Polling Locations and Voters*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (June 22, 2020)—risks that will be mitigated by the use of mail voting. It is therefore unsurprising that multiple states have issued executive orders or adopted legislation consistent with the Election Directive in response to the pandemic.[4]

Montana is not immune to the pandemic that has upended daily activity around the world and across the country. *See* Mike Kordenbrock, *Montana Adds 86 COVID-19 Cases; Statewide Active Cases at 2,127*, Billings Gazette (Sept. 14, 2020), https://billingsgazette.com/news/state-and-regional/montana-adds-86-covid-19-cases-statewide-active-cases-at-2-127/article_3746dfdb-0c93-5c26-b164-1d4baed5a226.html. And in any event, whether any particular response to an emergency is efficient or effective is a determination for the *Governor*, not Plaintiffs. Nothing in Section 10-3-104 requires or permits the sort of second-guessing that Plaintiffs now seek—let alone from a federal court precluded by the Eleventh Amendment from making such an adjudication. *See supra* Part IV.A.1.a; *see also In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) (noting that Supreme Court has

---

[4] *See* Kate Rabinowitz & Brittany Renee Mayes, *At Least 83% of American Voters Can Cast Ballots by Mail in the Fall*, Wash. Post (Aug. 20, 2020), https://www.washingtonpost.com/graphics/2020/politics/vote-by-mail-states/ (describing states that changed election rules due to coronavirus).

"disclaimed any judicial power to second-guess the state's policy choices in crafting emergency public health measures").

In short, because the Governor issued the Election Directive consistently with Montana law, Plaintiffs cannot succeed on the merits of Count I or II.[5]

### B.     The equitable factors do not support issuance of an injunction.

"[A]n injunction is an equitable remedy," and, as such, it must be deployed to achieve equitable ends, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982). The mere possibility that a law has been violated, standing alone, does not compel issuance of an injunction. *See id.* at 313 ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."). Instead, Plaintiffs are required to prove that they will suffer an irreparable injury that sufficiently outweighs the negative consequences the injunction will bring to bear on the other parties and the public. *See Winter*, 555 U.S. at 20. It is notable that, in their Motion, Plaintiffs devote barely two pages to the equities. *See* Mot. at 19–21. This is unsurprising; the equities strongly militate *against* issuing a preliminary injunction, and Plaintiffs have failed to meet their burden.

---

[5] Plaintiffs do not seek a preliminary injunction on the basis of Count III of their Complaint. Even if they had, Plaintiffs cannot succeed on the merits of Count III, as they lack standing to assert it and rely on a noncognizable theory of vote-dilution-by-fraud. *See* Motion to Dismiss, ECF No. 73 at 10–17, 22–23.

### 1.    Plaintiffs will suffer no injury absent an injunction.

The U.S. Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction," which is consistent with its "characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22; *accord All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) ("Under *Winter*, plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction."). Simply stated, Plaintiffs have not proven that they will suffer irreparable injury. They make various assertions in support of a finding of irreparable injury, none of which is persuasive—and certainly none of which satisfies the clear showing that they must make to justify injunctive relief.

At the outset, Plaintiffs suggest that altering the voting system might result in confusion and injury. *See* Mot. at 19. But while *major, last-minute* changes to electoral processes *by federal courts* should generally be avoided, *see, e.g.*, *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006), Plaintiffs provide no explanation—through evidence, caselaw, or even common sense—why election plans announced *by the State itself*, four months before the November Election, that maintain the status quo from the June Primary (which saw record turnout), would result in confusion, disenfranchisement, or diminished confidence. This is particularly true given that

even before the pandemic, most Montanans chose to vote by mail. *See Frequently Asked Questions: Absentee Voting*, Mont. Sec'y of State, https://sosmt.gov/elections/faq/#absentee-voting (follow "Absentee turnout" hyperlink) (last visited Sept. 17, 2020) (showing that more than 73 percent of voters cast absentee ballots in the 2018 federal general election).

Plaintiffs also claim that "[t]he damage to the individual, fundamental rights of the political party plaintiffs' voting members would likely be irreparable." *Id.* at 19. But while deprivation of constitutional rights can serve as irreparable injury, Plaintiffs have not established that any of their rights have been violated. The Elections and Electors Clauses are structural provisions of the Constitution that do not vest enforceable rights in Plaintiffs or their supporters in this case, *see* Motion to Dismiss, ECF No. 73 at 6–10, 19–21, and Plaintiffs have not proffered proof that any other rights are violated by the Election Directive.

Plaintiffs' only other basis for injury—and, judging by their evidentiary submissions and Complaint, the theory on which they place the most weight—is that "the Election Directive washes away many of the procedures and safeguards that the Montana State Legislature implemented, inviting illegitimate practices that will dilute the votes of honest voters in violation of the Constitution." Mot. at 19. This is what Plaintiffs are truly litigating against—the specter of voter fraud, a phantom threat that Plaintiffs continue to broadcast in the leadup to the November Election.

Plaintiffs essentially claim a vested right to police this alleged voter fraud through litigation. The problem with this argument is two-fold.

*First*, as discussed at length in Part IV.B.1 of Intervenor-Defendants' Motion to Dismiss, *see* ECF No. 73 at 12–14, the desire to prevent voter fraud is nothing more than a generalized grievance shared by every Montanan. Neither Plaintiffs nor their voters can claim any special right to prevent voter fraud, and so neither can claim irreparable injury.

*Second*, Plaintiffs have failed to substantiate their claim that the Election Directive will lead to an increase in voter fraud, let alone that such fraud harms "the ability of Republican voters to cast, and Republican candidates to receive, effective votes in Montana." Compl. ¶ 15. Indeed, that Plaintiffs chose *not* to seek injunctive relief on Count III, which alleges that the Election Directive facilitates fraud and consequent vote dilution, *see id.* ¶¶ 150–55, is telling—apparently even they do not believe that they have sufficient evidence to support this claim. In short, despite their vociferous claims of widespread fraud, Plaintiffs have not produced a shred of compelling evidence to support their allegations, and have certainly not demonstrated any relationship between an expansion of mail voting and a higher incidence of voter fraud, in Montana or anywhere else.

As explained by Dr. Michael Herron, an expert on election administration who has published over twenty peer-reviewed articles in the field—including two

specifically on voter fraud—the evidence cited by Plaintiffs falls well short of establishing any relationship between mail voting and fraud. None of their evidence qualifies as peer-reviewed research, which remains the gold standard for validating research and determining the reliability of evidence. *See* Herron Decl. ¶¶ 70–92; *see also Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 841 (9th Cir. 2001); Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 13 (3d ed. 2011). And simply citing to isolated and infrequent incidents of mail ballot issues in jurisdictions *outside of Montana* does not constitute the systematic inquiry necessary to establish a link between expansion of mail voting in the manner ordered by the Election Directive and an increase in voter fraud in Big Sky Country. *See* Herron Decl. ¶¶ 127–35. Instead, "the literature on voter fraud in the United States has a clear and consistent finding: this form of fraud is rare." *Id.* ¶ 1(I); *see also Cook Cnty. Republican Party v. Pritzker*, No. 20-cv-4676, slip op. at 5 (N.D. Ill. Sept. 17, 2020), ECF No. 59 ("The isolated incidents cited lend support to the proposition that over time voter fraud rates have 'remained infinitesimally small.'").[6] This is especially true in Montana, where Dr. Herron's review of elections from 2012 to 2020—a period during which nearly three million ballots were cast—turned up little to no

---

[6] The court's order in *Cook County Republican Party* is attached as Exhibit 3.

evidence of fraud. *See id.* ¶ 68.[7] And there is no credible scholarship suggesting a link between universal mail voting and fraud. *See id.* ¶¶ 1(I), 24–69.

Ultimately, Plaintiffs' attempt to nudge their allegations of voter fraud from wholly speculative to somehow likely falls flat, as none of their evidence actually proves, or even suggests, that expanding mail voting in Montana will lead to increased fraud and diminished public confidence. Repeating the fiction of widespread voter fraud, even in a court of law, does not make it true—as evidenced by the repeated rejection of attempts to limit voting opportunities based on similarly speculative allegations. *See, e.g., People First of Ala. v. Sec'y of State*, 815 F. App'x 505, 513 (11th Cir. 2020) (concluding that state's "interest for maintaining the photo ID and witness requirements do not outweigh" burdens on voters where evidence "suggests that Alabama has not found itself in recent years to have a significant absentee-ballot fraud problem"); *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1036 (9th Cir. 2020) (en banc) (rejecting fraud-based justification for ballot collection ban where "[t]here has never been a case of voter fraud associated with ballot collection charged in Arizona" (quoting *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 852 (D. Ariz. 2018))); *Cook Cnty. Republican Party*, slip op.

---

[7] Indeed, during depositions in another recent Montana voting case, multiple state and local election officials testified that voter fraud is not an issue in Montana. *See* Exs. 5–8.

at 7–9 (considering evidence of fraud consisting of news articles and historical incidents and concluding that plaintiff "has provided no basis for concluding that its alleged harms are anything but speculative"); *Paher v. Cegavske* ("*Paher II*"), No. 3:20-cv-00243-MMD-WGC, 2020 WL 2748301, at *7 (D. Nev. May 27, 2020) (denying preliminary injunction where "Plaintiffs' claims of voter disenfranchisement are speculative at best"); *Paher v. Cegavske* ("*Paher I*"), No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813, at *6 & n.10 (D. Nev. Apr. 30, 2020) (finding that plaintiffs' "claim of voter fraud is without any factual basis"); *see also Driscoll v. Stapleton*, No. DV 20-408, slip op. at 9 (Mont. Jud. Dist. Ct. May 22, 2020) ("[T]he Court finds that there has never been a documented case of absentee ballot collection fraud in Montana.").[8] Plaintiffs have therefore failed to establish *any* injury, let alone a likely one, that they will experience absent injunctive relief.

### 2.   The balance of harms weighs strongly in favor of Defendants.

While Plaintiffs have not demonstrated a likely injury, enjoining Defendants' plans to expand access to mail ballots at this stage would have a devastating impact on Montanans' ability to participate meaningfully in the November Election. As discussed at Part IV.A.2 *supra*, the coronavirus still poses a significant threat in Montana. Without the Election Directive's safeguards, any eligible Montanans who

---

[8] The court's order in *Driscoll* is attached as Exhibit 4.

are unwilling or unable to incur the health risks to themselves and their families by voting in-person, and who cannot timely and successfully complete an absentee ballot application—or who unexpectedly fall ill on election day without having previously submitted an application—will suffer disenfranchisement.[9]

These disenfranchising effects would only be exacerbated if this Court enjoined the Election Directive and required the vast majority of local election officials to reverse course, after both they and the voters they serve have already planned for an election similar to the June Primary, in which mail ballots were *automatically* provided to voters. *See, e.g.*, *Election Information*, Yellowstone Cnty. Elections Off., https://www.co.yellowstone.mt.gov/elections (last visited Sept. 17, 2020) (Yellowstone County announcement that November Election will be "All-

---

[9] This is not merely a speculative risk. Normal absentee ballot procedures require election officials to process, track, and respond to ballot applications on an ad hoc basis, rather than systematically mail ballots to all voters on a fixed timeline. Recent elections in other jurisdictions have demonstrated the significant administrative burdens that this process places on election officials, particularly as requests for mail ballots have increased due to the pandemic. As a result, not all voters who have needed mail ballots have received them. *See, e.g.*, Amy Gardner et al., *Primary Voters in 8 States and D.C. Faced Some Confusion, Long Lines and Poor Social Distancing*, Wash. Post (June 2, 2020), https://www.washingtonpost.com/politics/in-pennsylvania-officials-prepare-for-coronavirus-civil-unrest-to-disrupt-tuesday-primary/2020/06/02/96a55c40-a4be-11ea-b619-3f9133bbb482_story.html. Wisconsin's April 2020 primary provides an instructive case study. There, some voters who did not receive their requested mail ballots were forced to vote in person. *See, e.g.*, Jim Malewitz, *Their Wisconsin Ballots Never Arrived. So They Risked a Pandemic. Or Stayed Home.*, Wis. Watch (Apr. 7, 2020), https://www.wisconsinwatch.org/2020/04/ballots-never-arrived-pandemic-or-stay-home.

Mail Ballot—Ballots mailed to all active and provisional voters"); *2020 Federal General Election—November 3, 2020*, Missoula Cnty. Elections Off., https://www.missoulacounty.us/government/administration/elections-office (last visited Sept. 17, 2020) (Missoula County announcement that "all eligible voters will receive a ballot by mail" for November Election); *see also Cook Cnty. Republican Party*, slip op. at 21–22 (denying preliminary injunction where plaintiff delayed in bringing suit and concluding that "enjoining the [challenged election law] approximately six weeks before the election would introduce even greater challenges into what already is an exceedingly difficult election to administer"); *Paher I*, 2020 WL 2089813, at *12 ("Plaintiffs' purported harm to them of being disenfranchised due to vote dilution, such disenfranchisement could be, even more concretely, claimed in the absence of the Plan (and additionally by confusion that may result by the Court enjoining the Plan, and appeal—which would surely follow)."). Moreover, local election officials are proceeding with implementation of the Election Directive, and have indicated that a departure from their current plans would be not only disruptive, but infeasible. *See, e.g.*, Jay Kohn, *Montana Elections Officials Gearing up for All-Mail Election*, KTVQ (Sept. 8, 2020), https://www.ktvq.com/news/local-news/montana-elections-officials-gearing-up-for-all-mail-election. And Intervenor-Defendants, who represent the interests of Democratic voters and candidates in Montana, would be forced to divert and expend resources in order to remedy the

suppressive effects of Plaintiffs' suit. For example, they would need to educate voters in counties that have opted in to the Election Directive on the need to timely request absentee ballots, given that those voters are expecting to receive mail ballots automatically.

Depriving a voter of the opportunity to cast a ballot is not only a significant harm—"[t]o disenfranchise a single voter is a matter for grave concern," *Serv. Emps. Int'l Union, Local 1 v. Husted*, 906 F. Supp. 2d 745, 750 (S.D. Ohio 2012)—but an irreparable harm as well. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress."); *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016) ("This isn't golf: there are no mulligans."). Plaintiffs have not demonstrated any likely injury that would occur absent an injunction, let alone disenfranchisement. As discussed above, they are litigating against a mere apparition of alleged fraud that vanishes under the light of even limited scrutiny. As one court has perceptively noted, "a preoccupation with mostly phantom election fraud leads to real incidents of disenfranchisement, which undermine rather than enhance confidence in elections." *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 903 (W.D. Wis. 2016), *aff'd in part, rev'd in part on other grounds sub nom. Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020). Enjoining Defendants' plans for vote by mail would not prevent any harms to Plaintiffs—their supposed harms are, ultimately,

imaginary—but would indisputably disenfranchise Montana voters who are unable to cast ballots in the November Election. Accordingly, the balance of equities does not favor issuance of the requested injunction.

### 3. The public interest would not be served by an injunction.

An injunction precluding Defendants' efforts to expand mail voting for the November Election—resulting in likely disenfranchisement of eligible voters—will not serve the public interest. "By definition, '[t]he public interest . . . favors permitting as many qualified voters to vote as possible.'" *League of Women Voters*, 769 F.3d at 247 (alterations in original) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012)). This includes not only members of the Democratic Party represented by Intervenor-Defendants, but *all* eligible Montanans who would risk disenfranchisement if Plaintiffs receive their requested injunctive relief. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) ("The public interest inquiry primarily addresses impact on non-parties rather than parties." (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002))).

By contrast, the public interest would most assuredly be ill-served if voters' constitutional rights were violated to safeguard against nonexistent instances voter fraud. *See, e.g.*, *Common Cause/Ga. v. Billups*, 439 F. Supp. 2d 1294, 1359–60 (N.D. Ga. 2006). This is particularly true given that Montana already safeguards the

integrity of elections, and polices potential electoral fraud, through other means. *See Paher I*, 2020 WL 2089813, at *7 ("Plaintiffs' overarching theory that having widespread mail-in votes makes the Nevada election more susceptible to voter fraud seems unlikely where the Plan essentially maintains the material safeguards to preserve election integrity."); *Cook Cnty. Republican Party*, slip op. at 9 (finding no irreparable harm from purported ballot fraud where "the actions described . . . are criminal" and "[i]f Plaintiff learns of such illegal activity it should be reported [] to the proper authorities").[10]

## V.    CONCLUSION

Plaintiffs seek the extraordinary remedy of a preliminary injunction to dismantle Defendants' plans to allow all eligible Montanans to vote safely by mail in the face of a global health crisis. But they have failed to explain how the Court can grant the relief they seek consistent with the Eleventh Amendment; to establish standing; to demonstrate a likelihood of success on the merits; and, most notably, to actually prove that increasing Montanans' access to the ballot will result in fraud or

---

[10] As the letter from the Montana Association of Counties noted, "[m]ail ballot elections have security features that polling place elections do not, and anti-fraud protections are written into Montana law." Ex. 1 at 2. For example, it is a crime under Montana law to vote improperly or more than once during the same election, Mont. Code Ann. § 13-35-210; to forge a ballot, *id.* § 13-35-207; to coerce or threaten voters, *id.* § 13-35-218; to change a voter's completed ballot, *id.* § 13-35-205; or to deceive a disabled voter requiring assistance, *id.* §§ 13-13-118–19, 13-35-208.

compromise the integrity of the November Election. Because Plaintiffs have not, "*by a clear showing*, carrie[d] the burden of persuasion," *Lopez*, 680 F.3d at 1072 (quoting *Mazurek*, 520 U.S. at 972), Intervenor-Defendants respectfully request that this Court deny their motion for preliminary injunction.

DATED this 17th day of September, 2020

By: _____ */s/ Abha Khanna*_____

Abha Khanna*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Tel: (206) 359-8000
akhanna@perkinscoie.com

Peter M. Meloy
MELOY LAW FIRM
P.O. Box 1241
Helena, Montana 59624
Tel: (406) 442-8670
mike@meloylawfirm.com

*Attorneys for Intervenor-Defendants DSCC, DCCC, and Montana Democratic Party*

*\*Admitted pro hac vice*

# EXHIBIT INDEX

| Exhibit No. | Description | No. of Pages |
|---|---|---|
| 1 | Letter from Shantil Siaperas, representing the Montana Association of Counties and Montana Association of Clerk & Recorders/Election Administrators, to Defendant Stephen Bullock | 8 |
| 2 | Declaration of Dr. Michael Herron | 48 |
| 3 | Memorandum Opinion and Order Denying Motion for Preliminary Injunction, *Cook County Republican Party v. Pritzker*, No. 20-cv-4676 (N.D. Ill. Sept. 17, 2020) | 22 |
| 4 | Findings of Fact, Conclusions of Law, Memorandum, and Order Granting Plaintiffs' Motion for Preliminary Injunction, *Driscoll v. Stapleton*, No. DV 20-408 (Mont. Jud. Dist. Ct. May 22, 2020) | 17 |
| 5 | Excerpts of deposition transcript of Dana Corson | 10 |
| 6 | Excerpts of deposition transcript of Jon Bennion | 6 |
| 7 | Excerpts of deposition transcript of Scott Cook | 5 |
| 8 | Excerpts of deposition transcript of Rina Moore | 5 |

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(d)(2)(E) of the Montana Federal Local Rules of Procedure, I certify that the foregoing Opposition to Plaintiffs' Motion for Preliminary Injunction is printed with a proportionately spaced Times New Roman typeface of 14 points and is double-spaced, and that the word count calculated by Microsoft Word is 6,443, excluding the caption, tables of contents and authorities, exhibit index, and certificates of compliance and service.

DATED this 17th day of September, 2020

By:      */s/ Abha Khanna*
Abha Khanna*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Tel: (206) 359-8000
akhanna@perkinscoie.com

Peter M. Meloy
MELOY LAW FIRM
P.O. Box 1241
Helena, Montana 59624
Tel: (406) 442-8670
mike@meloylawfirm.com

*Attorneys for Intervenor-Defendants DSCC, DCCC, and Montana Democratic Party*

*\*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on counsel of record in this matter via the Court's ECF system.

DATED this 17th day of September, 2020

By: ____/s/ Abha Khanna_____
Abha Khanna*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Tel: (206) 359-8000
akhanna@perkinscoie.com

Peter M. Meloy
MELOY LAW FIRM
P.O. Box 1241
Helena, Montana 59624
Tel: (406) 442-8670
mike@meloylawfirm.com

*Attorneys for Intervenor-Defendants DSCC, DCCC, and Montana Democratic Party*

*\*Admitted pro hac vice*